```
                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
                        HAMMOND DIVISION


BERNEY R. FALLS,                )
                                )
          Plaintiff             )
                                )
     v.                         )   Case No. 2:05 cv 67
                                )
ISPAT INLAND, INC. and UNITED   )
STEELWORKERS OF AMERICA,        )
                                )
          Defendants            )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendant, Ispat Inland, on January 26, 2007 (DE 36), and the Motion for Summary Judgment filed by the defendant, United Steelworkers, on January 29, 2007 (DE 38). For the reasons set forth below, both motions are **GRANTED**.

Background

Berney R. Falls began working for Inland Steel, now Ispat Inland, as a laborer in April 1977. (Deposition of Berney R. Falls, p. 6) During the course of his employment, Falls was found guilty of crimes on three occasions. (Falls Dep. pp. 8-13) Most recently, Falls pled guilty to unlawful transportation of a firearm, and according to his plea agreement, he was sentenced to begin a 15-month period of incarceration on March 1, 2003. (Falls Dep. p. 13)

At some time near December 2002, between his sentencing and the date on which he was to begin serving the sentence, Falls discussed with Ispat and United Steelworkers ("Union") represen-

tatives the possibility of reinstatement to his job following his prison term. Falls first discussed his impending prison term with Gabe Rocha, his immediate supervisor. (Falls Dep. p. 17) According to Falls, Rocha stated that Falls would be able to return to his job following his incarceration. (Falls Dep. p. 18)

Falls also met with Dean Schramm, the general manager of Falls' area at the steel mill, and Pete Fernandez, the union representative or "grievance man," assigned to this section of the mill.  (Falls Dep. pp. 14, 21)  The parties dispute the substance of this meeting. Falls stated that he informed Schramm that his incarceration would last 15 months and that Schramm responded that "he would keep my job for me." (Affidavit of Berney Falls, ¶ 2) In his affidavit, Falls indicated that he met twice with Schramm. (Falls Aff. ¶ 2) In his deposition, he stated that the two met only once and that Schramm

> said my job would be there when I got back. This was - I asked him if he would put it in writing. At that point, he says "No, I could not do that. I - I can't put it in writing. I won't put it in writing, but," he says, "as far as I am concerned, your job will be here waiting for you when you get back."

(Falls Dep. p. 15)

Fernandez, in his affidavit, indicated that this meeting took place in February 2002. (Affidavit of Pete L. Fernandez) Even assuming that Fernandez inadvertently meant to indicate 2003, which generally places the meeting in the period between Falls' sentencing and his incarceration, Fernandez also placed the parties' sole meeting in February, not December, and indi-

cated that at this meeting, "Berney explained his situation and asked Dean [Schramm] if he could hold his job until his release." (Fernandez Aff.) According to Fernandez' account, Schramm responded that he would discuss the matter further with "labor relations" regarding "what the process was in these cases" but otherwise gave no assurances.  (Fernandez Aff.)

Falls next discussed the availability of being reinstated following his prison term with Dennis Shattuck, chairman of the Union grievance committee. (Falls Dep. p. 21; Affidavit of Dennis Shattuck ¶ 1)  Falls related that he had several meetings with Shattuck who directed that he see a Mr. Reed. (Falls Dep. pp. 23, 22, 24) Falls testified that Reed provided him with two forms to complete in anticipation of the discharge letter that he would receive during his incarceration.  (Falls Dep. p. 25) According to Falls, one of the forms provided for a continuance of the hearing on his presumably forthcoming discharge. (Falls Dep. p. 30)

Falls also met with Louise Aguilar, another Union representative. (Falls Dep. p. 33) Falls stated that Aguilar also told him that on his release his job would be available. (Falls Dep. p. 33) Shattuck testified similarly, stating that he was contacted in early 2003 by Falls with the news of his conviction. (Shattuck Aff. ¶ 3) In response, Shattuck contacted Craig Lamm in Ispat's Union Relations Department. (Shattuck Aff. ¶ 4)  According to Shattuck, Lamm indicated that Falls could be reinstated if he was released within six months. (Shattuck Aff. ¶ 4) However,

3

Lamm testified more generally, and less conclusively, that Falls could be returned to employment if his incarceration was limited to a "matter of months." (Affidavit of Craig Lamm, ¶ 4)

The parties' dispute also centers upon statements made by Union representatives regarding how long Falls' job would remain open. According to Falls' testimony, Shattuck was the only Union representative who made any representation regarding the amount of time Falls' job would be held open. (Falls Dep. p. 35) However, later testimony seems to indicate that Falls claimed to have received assurances from Rocha, Reed, and Aguilar. Falls further testified that Shattuck indicated the job could be held open for only six months, despite the knowledge that his prison term was for 15 months, but that he made this statement only after Falls was released from prison and returned to Ispat seeking his job. (Falls Dep. pp. 36-37) However, in his affidavit, Lamm indicated that he gave Shattuck the six-month deadline prior to Falls' incarceration, and Shattuck testified, in contradiction to Falls' statement, that he delivered this news to Falls before Falls left to serve his sentence. (Lamm Aff. ¶¶ 4-5; Shattuck Aff. ¶¶ 4-6) Finally, while Falls stated that he told Shattuck that his incarceration would last 15 months, Shattuck testified that Falls told him the incarceration would be for a period of six months. (Shattuck Aff. ¶ 4)

Shortly after he began serving his sentence, Falls learned that a letter from Ispat gave him notice of termination and referred to a hearing on his discharge. (Falls Dep. p. 41) In a

4

phone conversation either with Falls directly from prison or with Falls' girlfriend, Linda Perryman (his deposition is not clear on this), the Union representative, Fernandez, remarked that there was no need for Perryman to attend this hearing on Falls' behalf and that, because of the forms Falls had completed, the hearing would be continued until some time after his release. (Falls Dep. p. 42)

Falls was released after serving 11 months of his sentence and, while serving 30 days at a halfway house, tried repeatedly to contact general manager Schramm. (Falls Dep. p. 48)  Falls eventually reached Shattuck, and a hearing was scheduled that Schramm attended. (Falls Dep. p. 48) At this meeting, Falls' suspension letter and his incarceration were not discussed, and instead, the meeting focused upon an incident in which Falls was disciplined for improperly operating plant equipment. (Falls Dep. p. 51) At the conclusion of the meeting, Falls was instructed to follow-up within three days. (Falls Dep. p. 51) Approximately six days later, Falls met with Shattuck, who indicated that Falls' job was held open for only six months despite alleged representa-tions made by Union representatives Reed and Aguilar that his job remained open. (Falls Dep. pp. 61-62)

Contradicting his earlier statement, Falls also indicated that his conversation with Shattuck did not occur about six days after this meeting but took place "several days after I had went to the EECO [sic]." (Falls Dep. p. 65) On the charge that Falls filed with the EEOC, he indicated that he spoke with Shattuck on

5

April 16, 2004, the same day that he filed the EEOC charge, and that Shattuck advised him that he had been terminated one year earlier, approximately five weeks into his prison term, when his discharge letter was sent. (Falls Dep. p. 69)

In his EEOC charge, Falls stated that he was terminated despite the assurances that his job would be held open and that he was aware of African-American and Hispanic employees who were not terminated under similar circumstances. (EEOC Charge, p. 1) Falls indicated his race as "white" on the charge but also stated that he alleged discrimination based on his status as a native American Indian, a detail about his ancestry that Falls first learned of during his incarceration. (Falls Dep. p. 78)

Ispat first moved for summary judgment in this matter prior to the consent of this case to magistrate judge jurisdiction. In that motion, the district court denied summary judgment, noting first that Ispat had not addressed Falls' prima facie case but instead sought summary judgment on the basis of its legitimate, non-discriminatory reason for terminating Falls' employment, specifically the duration of Falls' absence. Further, the district court found that the parties' dispute regarding whether Ispat had agreed to hold Falls' job open for six or 15 months left Ispat's defense subject to questions of fact. If he had been promised the ability to return to his job after a 15-month absence, then claiming that he legitimately was fired because he was absent for greater than six months was pretextual.

## Discussion

6

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); ***Lawrence v. Kenosha County***, 391 F.3d 837, 841 (7th Cir. 2004); ***Branham v. Snow***, 392 F.3d 896, 901 (7th Cir. 2004); ***Windle v. City of Marion***, ***Indiana***, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  ***Adickes v. S.H. Kress & Company***, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); ***Lawrence***, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law.  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); ***Ballance v. City of Springfield, Illinois Police Department***, 424 F.3d 614, 616 (7th Cir. 2005); ***Hottenroth v. Village of Slinger***, 388 F.3d 1015, 1027 (7th Cir. 2004); ***Palmer v. Marion County***, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts.  ***Spiegula v. Hull***, 371 F.3d 928, 935 (7th Cir. 2004); ***Hines v. British Steel Corporation***, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated

simply because motive or intent are involved." ***Roger v. Yellow Freight Systems, Inc***., 21 F.3d 146, 148 (7th Cir. 1994).  *See also **Miller v. Borden, Inc***., 168 F.3d 308, 312 (7th Cir. 1999); ***Plair v E.J. Brach & Sons, Inc.***, 105 F.3d 343, 346 (7th Cir. 1997); ***United Association of Black Landscapers v. City of Milwaukee***, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> ***Anderson***, 477 U.S. at 250, 106 S.Ct. at 2511

*See also **Reeves v. Sanderson Plumbing Prods., Inc***., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); ***Celotex Corp***., 477 U.S. at 322-323, 106 S.Ct. at 2553; ***Branham***, 392 F.3d at 901; ***Lawrence***, 391 F.3d at 841; ***Hottenroth***, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); ***Schuster v. Lucent Technol-***

*ogies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

Falls alleges that he was denied reinstatement on the basis of race. The defendants are entitled to summary judgment on the claim that Falls was discriminated against on the basis of his Native American ancestry. Falls' burden ultimately is to prove that Ispat and the Union discriminated against him because of race. If Falls himself did not know of his Native American ancestry at the time of the events forming the basis of his complaint, Ispat and the Union cannot be charged with that knowledge and cannot be charged with acting on knowledge they did not possess.

Falls presents no direct evidence of racial discrimination on the basis of being white and no argument that events, though inconclusive in themselves, together demonstrate "a convincing mosaic of discrimination against the plaintiff." **Troupe v. May Dep't Stores Co.**, 20 F.3d 734, 737 (7th Cir.1994). *See also* **Cerutti v. BASF Corp.**, 349 F.3d 1055, 1061 (7th Cir. 2003). Consequently, Falls must proceed according to the **McDonnell Douglas** burden-shifting framework. **McDonnell Douglas Corp. v. Green**, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973); **Barricks v. Eli Lilly and Company**, 481 F.3d 556, 559 (7th Cir. 2007); **Keri v. Board of Trustees of Purdue University**, 458 F.3d 620, 644 (7th Cir. 2006). Through this method, a plain-

9

tiff typically must show (1) membership in a protected class, (2) performance that met the employer's legitimate expectations, (3) an adverse employment action, and (4) similarly situated employees outside the class who were treated more favorably. *Barricks*, 481 F.3d at 559. Where, as here, a plaintiff is a member of a majority, so-called reverse discrimination, the plaintiff naturally cannot show membership in a protected class. Instead, a plaintiff is required to show "background circumstances" that "support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Hague v. Thompson Distribution Company*, 436 F.3d 816, 821 (7th Cir. 2006)*(quoting* *Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004); *Mills v. Health Care Service Corporation*, 171 F.3d 450, 456 (7th Cir. 1999). *See also* *Rayl v. Fort Wayne Community Schools*, 87 F.Supp.2d 870, 883-84 (N.D. Ind. 2000).

If Falls is able to meet this initial burden, Ispat, under a burden of production, may articulate a legitimate, non-discriminatory reason for its action, which Falls, who retains the ultimate burden of proof, may attack as pretextual. *Barricks*, 481 F.3d at 459.

The parties' arguments largely focus upon this later stage of the analysis. Ispat contends that Falls was not reinstated because his absence exceeded six months, and Falls rebuts this statement with his own statement that he was promised a 15-month period of time.

The parties, who visited this issue in the first round of

summary judgments, revisit it now without significant change. Ispat has butressed Schramm's testimony with that of Fernandez. Both individuals now testify that at their meeting with Falls no specific representations were made regarding how long Falls' job would be held open, if at all. This new evidence does not lift this question from the realm of disputed issues. Further, because this matter is before the court on the defendants' motions for summary judgment, disputed questions are resolved in Falls' favor, and the court does not weigh evidence. Accordingly, this additional evidence does not affect summary judgment.

However, though the defendants' argument that Falls has not met the prima facie case is perhaps cursory, it is no more so than Falls' complete failure to respond to it. In fact, Falls, who offered no response at all to the motion for summary judgment filed by the Union, offers little more than a single paragraph of argument in response to Ispat's motion. Ispat's motion was sufficient to put Falls on notice that the sufficiency of his prima face case was at issue. Further, the court agrees that Falls has not met his initial burden of showing a prima facie case. See **Scaife v. Cook County**, 446 F.3d 735, 740 (7th Cir. 2006); **Hague**, 436 F.3d at 823 ("Normally a court should first determine if a plaintiff has established a prima facie case before subjecting the employer to the pretext inquiry.").

Falls has not presented any evidence to show "background circumstances" under the first prong of the prima facie case in a claim based upon majority, or "reverse," discrimination. See

11

*Mills*, 171 F.3d at 457 ("[A] plaintiff in a reverse discrimination case must at least show one of the background circumstances these other courts have alluded to."); *Rayl*, 87 F.Supp.2d at 883-84 (N.D. Ind. 2000). Further, there is no apparent dispute that Falls, prior to his incarceration, was performing his job to Ispat's expectation or that Ispat's decision not to reinstate him is an adverse employment action. Accordingly, while the second and third steps of Falls' prima facie case appear to have been met without controversy, Falls has ignored the first element and has presented no credible evidence that any similarly situated person was granted opportunities that he was denied.

To meet this fourth step, Falls must identify similarly situated individuals from outside his own class, in this case non-whites, who were treated more favorably. The inquiry "is a flexible, common sense inquiry whose requirements vary from case to case." *Barricks*, 481 F.3d at 560 (*citing* **Humphries v. CBOCS West, Inc**., 474 F.3d 387, 404-05 (7th Cir. 2007). The similarity under this inquiry requires finding "nearly identical" characteristics in the "performance, qualifications, and conduct" of the employees. *Keri*, 458 F.3d at 644. Most commonly, this is met by comparing a plaintiff to another employee who worked under the same supervisor, whose performance was measured by the same standards, and who engaged in similar conduct. *Keri*, 458 F.3d at 644.

Falls alleges that there were two African-American employees and one Hispanic who were incarcerated, and after release, re-

12

turned to their jobs at Ispat. The record is virtually barren of details regarding these individuals. In his deposition, Falls alleges the existence of these individuals but also states that he does not have any personal knowledge that they were in fact incarcerated and returned to work. He also states that he does not recall from whom he learned of these individuals. Finally, Falls presents no evidence from which the court, if Falls had supported the fact of these individuals' incarcerations, could conclude that they are in any way similarly situated. Falls did not indicate in which departments these individuals worked, how their work records compared to his, whether their convictions and incarcerations were comparable to his, or whether these individuals were incarcerated and reinstated at generally the same time period in which Ispat refused to reinstate him. This lack of evidence is fatal to Falls' ability to withstand summary judgment.  See **Scaife**, 446 F.3d at 740 ("Scaife did not list instances in which the three white men were late, did not indicate whether they had the same supervisor as he did, nor did he say how the terms and conditions of his employment differed.").

Accordingly, while there may be something slightly greater than a scintilla of evidence raising doubt about Ispat's stated reason for failing to reinstate Falls, there is no evidence that this was done because Falls is white. Accordingly, Title VII offers Falls no relief. Ispat is entitled to summary judgment.

Falls' claims against the Union are subject to a separate analysis under Title VII. In his complaint, he charges that the

13

Union "failed to do anything to protect his job." (Complaint, p. 2) Assuming that Falls' claim arises under 42 U.S.C. §2000e-2(c), the provision within Title VII that addresses labor unions, Falls is required to establish a prima facie case by showing (1) that Ispat violated the collective bargaining agreement, (2) the union let this breach go unrepaired, constituting a breach of its own duty of representation, and (3) evidence that racial animus motivated the union failure to cure the breach. *Greenslade v. Chicago Sun-Times,* Inc., 112 F.3d 853, 866 (7th Cir. 1997); *Bugg v. International Union of Allied Industrial Workers of America*, 674 F.2d 595, 598 n.5 (7th Cir. 1982)(cert. denied, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982)). When, as here, a party has offered no response to a motion for summary judgment, the court will treat the moving parties' factual assertions as uncontested. L.R. 56.1(b); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). The entry of summary judgment is not automatic and may be granted only when the undisputed facts lead to judgment as a matter of law. Rule 56(c); *Burdick v. Koerner*, 179 F.R.D. 573, 575 (E.D. Wis. 1998).

As in the claim against Ispat, Falls must show that the Union's actions were taken because of his race. The court assumes that under this separate test, Falls still may show racial bias inferentially, including through a comparison to similarly situated employees. *See e.g. Catley v. Graphic Communications International Union, Local 277-M*, 982 F.Supp. 1332, 1341 (E.D. Wis. 1997) ("There was no evidence that the union had treated the

14

plaintiff differently than similarly situated females."). However, as already noted, the factual record in this matter lacks any credible evidence, on the part of Ispat or the Union, to suggest racial bias. Accordingly, even if Falls has marshaled an argument to show that the first two prongs of this three-part standard were met, he cannot show that the third prong is met. Accordingly, the Union also is entitled to summary judgment.

Finally, Falls has made allegations that he was promised his job after his release from prison, but there appears to be a dispute concerning how long the job would remain open. Because this is a Title VII claim, not a breach of contract claim, any promises made to him are irrelevant.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, Ispat Inland, on January 26, 2007 (DE 36), and the Motion for Summary Judgment filed by the defendant, United Steelworkers, on January 29, 2007 (DE 38), are **GRANTED**

ENTERED this 15th day of June, 2007

s/ ANDREW P. RODOVICH
United States Magistrate Judge